# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| ) | |
| ) | |
| **ROBERT FRANCIS O'BRIEN, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| ) | |
| **ANDREW M. SAUL,** ) | **Civil Action No. 18-12634-DJC** |
| **Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |
| ) | |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                    **March 11, 2020**

### I.      Introduction

Plaintiff Robert Francis O'Brien, Jr. ("O'Brien") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA").  R. 181-89.[1]  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), O'Brien brings this action, D. 1, for judicial review of the final decision of Andrew M. Saul, Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on August 30, 2018, denying his claim, R. 13-26.  Before the Court are O'Brien's motion to reverse the Commissioner's decision, D. 12, and the Commissioner's motion to affirm that decision, D. 16.  For the reasons discussed below, O'Brien's motion to reverse is GRANTED IN PART and DENIED IN PART,

---

[1] "R." refers to citations to the administrative record filed at D. 11.

the Commissioner's motion to affirm is GRANTED IN PART and DENIED IN PART and the

matter is remanded to the ALJ for proceedings consistent with this decision.

## II.     Factual Background

O'Brien ceased working as a carpenter on November 4, 2016 at the age of fifty.  R. 68,

183.  In May 2017, he alleged disability due to bipolar disorder, panic attacks, social anxiety, high

blood pressure, polycythemia, sleep apnea, dyslexia, asthma and chronic obstructive pulmonary

disease ("COPD").  R. 181, 240.

## III.    Procedural Background

O'Brien filed a claim for SSDI with the SSA on May 8, 2017, alleging that he was disabled

as of November 4, 2016.  R. 183.  The disability examiner initially denied his claim on July 3,

2017, R. 97, and again denied his claim on September 25, 2017 after reconsideration, R. 113.

O'Brien filed a timely request for a hearing before an ALJ on October 18, 2017.  R. 127-28.  The

ALJ held a hearing on July 10, 2018.  R. 34.  The ALJ determined that O'Brien did not have a

disability and denied O'Brien's claims.  R. 25.  The Appeals Council denied O'Brien's request for

review of the ALJ decision on October 23, 2018.  R. 1. O'Brien then initiated this action.  D. 1.

## IV.    Discussion

### A.     Legal Standards

#### 1.      Entitlement to Disability Benefits

A claimant's entitlement to SSDI turns in part on whether they have a "disability," defined

in the Social Security context as an "inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. §§ 416(i), 423(d)(1)(a); 20 C.F.R. § 404.1505.  The inability must be severe,

rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

Commissioners must follow a five-step process when they determine whether an individual is disabled for Social Security purposes.  20 C.F.R. § 404.1520.  All five steps are not applied to every applicant; the determination may be concluded at any step along the process.  Id.  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  Id.  Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  Id.  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  Id.  Fourth, if the applicant's residual functional capacity ("RFC") is such that he or she can still perform past relevant work, then the application is denied.  Id.  Fifth and finally, if the applicant given his or her RFC, education, work experience and age is unable to do any other work, the application is granted.  Id.

2.    *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as

adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

The Commissioner's factual findings, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Chater, 172 F.3d at 35 (citations omitted).  Thus, if the claimant demonstrates that the ALJ made a legal or factual error, Manso-Pizarro, 76 F.3d at 16, "the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard."  Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotation marks omitted); see 42 U.S.C. § 405(g).

## B.   **Before the ALJ**

### 1.   *Medical History Presented to the ALJ*

#### a)   Left-Knee Impairment

Dr. Morley diagnosed O'Brien with a meniscus tear in his left knee in January 2018. R. 1467.  Dr. Malone performed surgery on January 29, 2018 to repair the tear.  R. 1469-71. O'Brien commenced physical therapy treatment shortly after the surgery.  R. 1162.  His knee responded well to the treatment over the ensuing weeks.  R. 1184, 1188, 1472-73.  By the beginning of April 2018, O'Brien had completed therapy and Dr. Malone reported that he was "more comfortable with day to day activity" and experiencing only "[m]ild achiness" with "no sharp pain or giving way."  R. 1475.  In May 2018, however, O'Brien "may have twisted [his knee] causing increased pain and swelling."  R. 1477.  Dr. Malone administered a cortisone injection to address the pain and swelling.  R. 1478.  O'Brien's knee "responded poorly" to the injection, R. 1480, although he was still able to "[a]mbulat[e] without any assist[ance]" and with "a subtle limp," R. 1479.  Dr. Malone ordered a "new MRI to insure [sic] no definitive new injury."  R.

1480.  As of the ALJ hearing seven weeks later, O'Brien had not yet undergone an MRI.  R. 61. O'Brien testified that an MRI had not been completed because he had yet to return to the orthopedist, R. 61.  O'Brien also testified that he "can't kneel down" nor stand for more than a couple of hours as a result of continued issues with his left knee.  R. 50.

### b)     Right-Knee Impairment

Previously, O'Brien had a right-knee replacement operation on October 19, 2015.  R. 833. Post-surgery status checks with Dr. Morley from December 2015 to March 2016 document a recovery without any major complications.  R. 833-38.  The "right knee [was] doing well with no pain on walking or standing" by January 2016.  R. 835.  O'Brien completed physical therapy in March 2016 and Dr. Morley cleared O'Brien to "return to work unrestricted."  R. 837.  O'Brien testified that he has not been able to squat or kneel since the end of 2015.  R. 65.

### c)     Deep Vein Thrombosis ("DVT")

O'Brien was diagnosed with left-lower-extremity DVT on September 30, 2017, at which point he started a regime of anti-coagulants.  R. 1259.  O'Brien's primary care physician, Dr. Chang, repeatedly assessed O'Brien with DVT throughout October, November and December of 2017.  R. 1197-1215.  Dr. Chang sent O'Brien to the emergency room on October 5, 2017 due to his DVT symptoms.  R. 1211.  O'Brien returned to the hospital on January 26, 2018 for doctors to insert an inferior vena cava filter on account of acute-on-chronic DVT.  R. 1401-21.  Doctors retrieved the filter in March 2018.  R. 1348-67.

### d)     Right-Shoulder Impairment

O'Brien reported right-shoulder weakness and discomfort on July 19, 2016.  R. 839.  When O'Brien did not respond to other treatment, R. 843, Dr. Morley ordered rotator-cuff surgery, R. 845-46.  O'Brien underwent surgery on November 7, 2016.  R. 847.  He recovered well over the

ensuing months, R. 847-50, and by May 10, 2017, showed minimal symptoms and had returned to the gym to workout, R. 851.

e)      Chronic Obstructive Pulmonary Disease ("COPD")

O'Brien's medical records show a diagnosis of COPD dating back to at least 2015.  R. 393. In September 2016, Lowell Hospital admitted O'Brien for several days when he came to the emergency room reporting shortness of breath.  R. 393-95.  Dr. Chang monitored his symptoms following discharge and continued to prescribe O'Brien daily dosages of an albuterol by nebulizer. R. 871-888, 1194-1227.  On several occasions from September 2016 to February 2018, O'Brien reported coughing and wheezing to Dr. Chang.  R. 871, 882, 1219.  In December 2017, O'Brien was again hospitalized after wheezing, coughing and experiencing shortness of breath.  R. 1256-59.

f)      Affective Disorder and Anxiety

O'Brien started seeing a psychiatrist, Dr. Bhan, by April 28, 2014 after exhibiting signs of affective disorder and anxiety.  R. 890.  O'Brien continued seeing Dr. Bhan until at least June 2018.  R. 1488-92.  In the week leading up to O'Brien's shoulder surgery in the beginning of November 2016, Dr. Bhan documented an uptick in O'Brien's anxiety and depressive feelings.  R. 894.  O'Brien underwent three psychiatric hospitalizations, precipitated by apparent suicide attempts while intoxicated, over the course of the following six weeks.  R. 463-72, 473-517, 518-528, 900.  Following the third hospital discharge in early January 2017, O'Brien followed up with Dr. Bhan bimonthly through February 2017.  R. 900-11.  Dr. Bhan noted impaired concentration, low energy and high anxiety but no suicidal ideation at those appointments.  R. 901, 904, 907. Those symptoms began to subside by late February 2017, R. 909-11, and continued to improve into March and April 2017, even as O'Brien started seeing Dr. Bhan only once per month, R. 912-

17. O'Brien's mental health symptoms remained relatively stable from that point through at least June 2018. R. 918-22.

### 2. *The ALJ Hearing*

At the July 10, 2018 administrative hearing, the ALJ heard testimony from O'Brien and Lawrence Take, a vocational expert ("VE"). R. 33-82.

### a)     O'Brien's Testimony

O'Brien testified at the hearing that he worked as a carpenter, but that he stopped working following surgery on his right shoulder in November 2016. R. 43-44. He had planned to return to work six months after the surgery. R. 45. While he recovered physically from the surgery by spring 2017, O'Brien testified that he "had trouble with depression and bipolar and . . . went downhill," R. 46, and could no longer perform his job as a result, R. 48. He also testified that he gets anxious and nervous around people and has trouble leaving the house. R. 53-54, 63, 66. He further stated that he stays home all day and does little beyond picking up around the house, watering the flowers, napping and watching television. R. 48, 51-53. He attends some regular medical appointments, R. 51, goes shopping with his wife, R. 53, and drives on his own to visit his mother once a week, R. 54-55. O'Brien said he is "constantly tired," at least in part because of medication side effects, and cannot get through the day without taking multiple naps. R. 53, 62-63. In addition to mental health issues, O'Brien also stated that he "can't kneel" nor "stand for a long period of time" as a result of surgery on his left knee in January 2018. R. 49-50. He noted that he has not been able to squat or kneel since the end of 2015 as a result of a right-knee replacement. R. 65. When asked about his education, O'Brien said that he graduated high school where he attended some special education classes. R. 40-41. He also stated that he could not read

in high school, is not currently able to read and write—including reading or writing a grocery list—and reads at a second-grade level.  R. 41-42, 60.

        b)     <u>VE's Testimony</u>

The VE testified about O'Brien's past work history as a carpenter helper, which the VE characterized as heavy-duty, semi-skilled work.  R. 68.  The ALJ asked the VE whether a hypothetical individual—who was limited to medium exertional work, simple, routine tasks with only occasional decision making and no more than occasional interaction with the public—could perform any jobs in the national economy.  R. 68.  The VE explained that an individual with these limitations could perform O'Brien's past work as a carpenter and the VE responded that such work would be precluded, R. 68, but the jobs of hand packer, hospital cleaner and dining room attendant would be available to such person.  R. 68-69.  The ALJ then asked the VE whether the same hypothetical individual with additional postural limitations and limitations on interactions with co-workers and supervisors could perform the three previously identified jobs.  R. 70.  The VE responded that such an individual would still be able to perform those jobs.  R. 70-71.  The VE explained that a similar hypothetical individual limited to light exertional work could perform the job of office cleaner, price marker and subassembler of electronics.  R. 71-72.  In response to questioning by O'Brien's attorney, the VE testified that none of the jobs he identified require the ability to follow written instructions because instructions in those job settings are provided verbally or through demonstration.  R. 73.  The VE testified that the light-level jobs require "some independent work skills" and that employers do not have the resources to provide occasional supervision following a 30-day introductory period.  R. 74.

3.        *Findings of the ALJ*

The ALJ followed the five-step analysis. See 20 C.F.R. § 404.1520. At step one, the ALJ found that "the claimant has not engaged in substantial gainful activity since November 4, 2016." R. 18.   At step two, the ALJ found that the claimant has several severe impairments including bilateral knee degenerative joint disease, deep vein thrombosis in the left leg, COPD, obesity, affective disorder, anxiety and post-surgery complications involving both knees and the right rotator cuff. R. 18.   At step three, the ALJ found that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 19.   The ALJ found that, given O'Brien's impairments, O'Brien has the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b) with certain limitation. R. 20.   In making this finding, the ALJ noted that while O'Brien's medically determinable impairments could reasonably be expected to cause O'Brien's alleged symptoms, O'Brien's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence." R. 21.   At step four, the ALJ found "the claimant is unable to perform past relevant work." R. 24.   At step five, the ALJ first found that O'Brien's limited literacy does not meet the SSA's definition of illiteracy where there was evidence that he reads at the second to third grade level and he received a high school education (while participating in some special education classes). Id.   The ALJ then concluded that "the claimant's age, education, work experience, and residual functional capacity" qualifies O'Brien to perform "jobs that exist in significant numbers in the national economy." Id. Accordingly, the ALJ found O'Brien is not disabled as defined in the Social Security Act. R. 25.

C.      **O'Brien's Challenges to the ALJ's Findings**

O'Brien contends that the case must be reversed because the ALJ's findings are not supported by substantial evidence.  D. 12-1 at 8-9.  First, O'Brien challenges the ALJ's physical RFC findings on the grounds that the ALJ i) improperly relied upon his own lay opinion of O'Brien's left-knee and DVT impairments as well as expert assessments that are based on an incomplete medical record, id. at 9-12, and ii) failed to consider medication side effects and pain, id. at 14.  Second, he challenges the ALJ's mental RFC findings on the grounds that the findings contradict iii) O'Brien's treating psychiatrist's records, iv) O'Brien's testimony v) and the state psychologists' assessments.  Id. at 12-14, 18.  Finally, O'Brien argues the ALJ's conclusion at step five that O'Brien could perform available jobs in the national economy is not supported by substantial evidence because vi) O'Brien is illiterate, id. at 14-16, and vii) the VE's testimony was inconsistent with the Dictionary Occupational Titles ("DOT"), id. at 16-18.

### 1.      *The ALJ's Physical RFC Findings*

O'Brien makes two challenges to the ALJ's physical RFC findings.  Id.  at 9-12, 14.

                a)      Physical RFC Is Not Supported by Substantial Evidence Because
                        the Assessments Are Based upon Incomplete Record and ALJ
                        Relied upon His Lay Opinion of Medical Evidence

O'Brien contends that the ALJ's physical RFC findings are not supported by substantial evidence because the ALJ gave great weight to the opinions of the state agency physicians whose assessments were based on an incomplete record, id. at 11-12, and therefore, the ALJ relied upon his own lay opinion regarding O'Brien's functional limitations, id. at 9-11.  It is undisputed that the assessments by Drs. Weeratne and Jao, the state physicians who assessed O'Brien's physical RFC on June 9, 2017, R. 92-93, and September 22, 2017, R. 99-109, were not based on O'Brien's full medical record, as O'Brien was assessed with and treated for DVT and a left-meniscus tear

following those assessments.  R. 1259 (noting that O'Brien was diagnosed with DVT on September 30, 2017), R. 1467 (diagnosing O'Brien with a left-meniscus tear on January 4, 2018). There would be no error if the medical evidence of these new impairments did not materially change the record on which Drs. Weeratne and Jao based their assessments, but where, as here, the ALJ was unqualified to determine the materiality of the new evidence, the state assessments cannot serve as substantial evidence.

"The opinion of a non-examining consultant cannot serve as substantial evidence if it is 'based on a significantly incomplete record' and fails to account for a deterioration in the claimant's condition." Ford v. Berryhill, No. 16-cv-11976-FDS, 2017 WL 4316094, at *10 (D. Mass. Sept. 28, 2017) (quoting Alcantara v. Astrue, 257 F. App'x 333, 334 (1st. Cir. 2007)).  "The record is significantly incomplete if the evidence added after the consultant's review materially changed the basis for assessing the claimant's limitations."  Blakley v. Saul, No. 18-cv-702-LM, 2019 WL 4668020, at *5 (D.N.H. Sept. 29, 2019) (citing Alcantara, 257 F. App'x at 334).  "The record remains materially unchanged where the new evidence either reveals no greater limitations or is arguably consistent with the consultant's assessment." Giandomenico v. U.S. Soc. Sec. Admin., No. 16-cv-506-PB, 2017 WL 5484657, at *4 (D.N.H. Nov. 15, 2017).  An ALJ can make commonsense judgments as to whether new evidence reveals greater limitations, see Douglas v. U.S. Soc. Sec. Admin., No. 15-cv-378-PB, 2016 WL 5660315, at *4 (D.N.H. Sept. 30, 2016), but they cannot interpret bare medical findings without an expert's assessment unless the medical records show only a "relatively mild physical impairment posing, to the layperson's eye, no significant restrictions." Giandomenico, 2017 WL 5484657 at *4 (quoting Roberts v. Barnhart, 67 F. App'x 621, 623 (1st Cir. 2003)); see Manso–Pizarro, 76 F.3d at 19 (remanding when record was "sufficiently ramified that understanding it requires more than a layperson's effort at a

commonsense functional capacity assessment"). The ALJ, by extension, does not have the capacity to formulate limitations of severe impairments that a medical expert has not assessed. See Duffany v. Berryhill, No. 16-cv-11888-IT, 2017 WL 4102585, at *9 (D. Mass. Sept. 15, 2017).

Here, contrary to the Commissioner's contention, D. 16 at 11, the ALJ did not simply render a commonsense judgment when he determined that O'Brien's left-knee and DVT impairments did not support further limiting O'Brien's RFC, see R. 21-22. Rather the medical records examined by the ALJ constituted bare medical findings, not assessments of functional limitations that could be understood by a layperson. See Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 432 (1st Cir. 1991) (noting that an ALJ is not qualified to assess functional limitations from bare medical findings such as "'mild effusion into left knee' with no edema and good range of motion in all joints"); Swales v. Berryhill, 245 F. Supp. 3d 290, 295-96 (D. Mass. 2017) (same for bare medical findings such as "no significant knee effusion," "no warmth or erythema," and "grind testing is positive"). The medical findings assessed by the ALJ here are like those assessed in Berrios Lopez and Swales. Compare R. 1477-80 (noting the extent of "effusion," "warmth or erythema," "degrees of motion" and "[p]ositive grind") with Swales, 245 F. Supp. 3d at 295-96 and Berrios Lopez, 951 F.2d at 432. Additionally, the ALJ found that O'Brien's DVT and left meniscus qualified as "severe impairments," R. 18, indicating that the medical findings suggest more than relatively mild impairments that the ALJ could assess without expert input, see Duffany, 2017 WL 4102585, at *8-9 (explaining that the ALJ does not have the capacity to formulate non-obvious limitations of severe impairments that a medical expert has not assessed).

Because the medical evidence that post-dated the assessments by Drs. Weeratne and Jao was technical and revealed more than relatively mild impairments, the ALJ was not qualified to

assess the limitations resulting from those impairments on his own. See Roberts, 67 F. App'x at 623 (holding that the ALJ was not permitted to make RFC assessment because record indicates more than mild impairment); Duffany, 2017 WL 4102585, at *9. "Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion." Alcantara, 257 F. App'x at 334. This Court accordingly vacates and remands the ALJ's decision on this sole issue to receive and consider expert medical opinion of O'Brien's RFC given his severe DVT and left-meniscus impairments. Although the Court is remanding as to this issue, it proceeds to address O'Brien's other challenges that do not warrant remand or reversal.

        b)        <u>The ALJ Did Not Err in His Consideration of Impairments from Medication Side Effects and Pain</u>

O'Brien argues that the ALJ erred by failing to consider whether medication side effects and pain warranted additional limitations in O'Brien's RFC. D. 12-1 at 14. Upon review of the ALJ's decision, the Court discerns no error. The ALJ considered O'Brien's testimony regarding medication side effects and pain and the ALJ's determination that O'Brien's testimony on those matters was not entirely consistent with the evidence is supported by substantial evidence.

The ALJ is obligated to consider medication side effects and pain in determining a claimant's RFC. See 20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2017 WL 5180304, at *8 (S.S.A. Oct. 25, 2017); see also 20 C.F.R. § 404.1545(e). Here, the ALJ heard testimony at the hearing regarding both. R. 50, 62-63. In his decision, the ALJ wrote, "[O'Brien's] medications also cause drowsiness and he allegedly takes two to three naps per day." R. 20. The ALJ later noted that O'Brien reported "some uptick in his knee pain." R. 21. The ALJ concluded, however, that O'Brien's statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely consistent with the evidence. R. 21.

Although O'Brien does not explicitly challenge the ALJ's credibility determination, that determination, as it relates to medication side effects and pain, is supported by substantial evidence.  With regard to O'Brien's alleged drowsiness from medication, Dr. Bhan's treatment notes in late 2017 and early 2018 describe O'Brien's energy as fair or moderate, R. 1498, 1502, 1506, 1508, and O'Brien stated that he had been feeling less tired shortly before the ALJ hearing, R. 1496.  On the occasions O'Brien reported tiredness or low energy, Dr. Bhan does not appear to have prescribed a change of treatment or medication.  See R. 1498, 1510, 1512, 1514.  Statements by O'Brien—in his testimony, R. 50, 52-53, 62-63, and as reflected in the function report, R. 255, 262, and disability reports, R. 276, 286—allege that drowsiness poses functional limitations.  The ALJ, however, need not accept the claimant's statements about the effects of O'Brien's medication at face value, especially where, as here, no statements by medical sources substantiate O'Brien's claims.  See Hagigeorges v. Astrue, No. 11-cv-11842-DPW, 2012 WL 5334771, at *13 (D. Mass. Oct. 25, 2012) (finding no more than harmless error in the ALJ's failure to consider medication side effects when none of plaintiff's doctors mention functional limitations resulting from side effects).  Even if the ALJ fully accepted O'Brien's testimony, drowsiness is not generally viewed as disabling "unless the record references serious functional limitations." Dunham v. Astrue, No. 10-cv-40246-TSH, 2013 WL 1192406, at *9 (D. Mass. Mar. 21, 2013) (quoting Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002)).  Nothing in this record references serious limitations due to drowsiness.

Nor do O'Brien's arguments regarding the ALJ's consideration of pain warrant reversal. O'Brien's statements about acute pain in his left knee are supported by medical opinion and a prescription for a narcotic-like pain reliever to treat moderate to severe pain in his left knee.  See R. 1477-80.  O'Brien, however, did not provide evidence that the acute pain caused ongoing

limitations greater than those found in his RFC.  Accordingly, remand is not warranted on these

grounds.  See Caterino v. Berryhill, 366 F. Supp. 3d 187, 194-95 (D. Mass. 2019) (affirming the

Commissioner's decision because "burden is on the plaintiff to present sufficient evidence of how

her alleged impairment limits her functional capacity" and "[she] has proffered no evidence tying

. . . her pain . . . to additional limitations . . . beyond those already determined by the ALJ").

2. *The ALJ's Mental RFC Findings Are Supported by Substantial Evidence*

O'Brien argues that the ALJ's mental RFC findings are not supported by substantial

evidence because the findings are at odds with i) O'Brien's treating psychiatrist's assessments, ii)

O'Brien's subjective assessment of his own mental health and iii) the state agency psychologists'

assessments.  D. 12-1 at 12-14, 18.

a) The ALJ Did Not Err in Discounting Dr. Bhan's Opinions

O'Brien challenges the ALJ's decision to give little weight to Dr. Bhan's opinions on two

grounds.  Id. at 12-14.  He first argues the ALJ misinterpreted Dr. Bhan's records.  Id. at 12-13.

O'Brien next argues the ALJ improperly relied upon Global Assessment of Function ("GAF")

scores to give limited weight to Dr. Bhan's opinions.  Id. at 13-14.

O'Brien's first contention faults the ALJ for concluding that O'Brien's mental status

remained "normal" from January 2017 to May 2018 even though Dr. Bhan diagnosed O'Brien

with depression, anxiety and obsessive-compulsive personality disorder over that period.  Id. at

12-13.  The ALJ does not, however, question these diagnoses.  He found at step two that O'Brien's

affective disorder and anxiety qualify as severe impairments.  R. 18.  The question at the RFC

stage is to what extent these impairments limit O'Brien's ability to perform certain work.  See 20

C.F.R. § 404.1545(a)(1); see also Andrade-Hermort v. Berryhill, 292 F. Supp. 3d 530, 532-34 (D.

Mass. 2018).

While Dr. Bhan's notes indicate O'Brien's concentration was "impaired" or "decreased" between January and March 2017, R. 900, 903, 906, 909, 912, his treatment notes since April 2017 indicate "fair" concentration,   R. 915, 918, 1496, 1499, 1502, 1506, 1508, 1510, 1512.   The treatment notes since April 2017 are consistent with the mental status examinations during the same period which indicate minimal impairments to O'Brien's speech, orientation, memory, concentration, insight and judgment.   The treatment notes and mental status examinations are also consistent with O'Brien's testimony at the hearing that he was "stable" and his mental health symptoms have not worsened in the last year and a half.   See R. 49.   The conclusions of Drs. Fitzpatrick and Lasky, the state agency psychologists who evaluated O'Brien's initial claim and reconsideration, that O'Brien's mental status would not preclude him from completing simple tasks with normal supervision over eight-hour days and forty-hour periods further substantiates the ALJ's determination.   See R. 94, 110.   The mental status examinations within normal limits and reviews by Drs. Fitzpatrick and Lasky provide adequate evidence to support the ALJ's finding that Dr. Bhan's assessments do not preclude O'Brien from performing light work, subject to additional non-exertional limitations.

O'Brien next argues that the ALJ erred in relying upon GAF scores to give limited weight to Dr. Bhan's opinions.   D. 12-1 at 13-14.   The ALJ is not required to give "specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [treating] medical sources."   20 C.F.R. § 404.1520c(a); see Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991).   Although an ALJ is not required to subscribe a specific weight to medical opinion, they must articulate "how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record."   20 C.F.R. § 404.1520c(b).

Supportability and consistency of a source's medical opinions are the most important factors in

evaluating the persuasiveness of those opinions.  20 C.F.R. § 404.1520c(b)2.  Here, the ALJ found

Dr. Bhan's opinions to be unpersuasive because they were inconsistent with the overall weight of

the evidence, including "consistently normal mental status examinations within the record,

[O'Brien's] reports of going to the gym, and [O'Brien's] generally benign subjective complaints."

R. 23.  Such a finding is supported by substantial evidence and there is accordingly no error.  See

Lynch v. Berryhill, 368 F. Supp. 3d 292, 296-97 (D. Mass. 2019) (holding that a claimant's ability

to perform some daily activities, conservative medical treatment and mostly normal mental status

examinations provided substantial evidence for the ALJ's finding of not disabled).

> b)     The ALJ Did Not Err in Discounting O'Brien's Subjective
> Statements

O'Brien next argues that the ALJ erred in discounting O'Brien's subjective statements

regarding his fatigue, depression, anxiety and inability to interact with others.  D. 12-1 at 13.  "A

fact-finder's assessment of a party's credibility, however, is given considerable deference and,

accordingly, a reviewing court will rarely disturb it."  Anderson v. Astrue, 682 F. Supp. 2d 89, 98

(D. Mass. 2010).  Because substantial evidence supports the ALJ's conclusion that O'Brien's

statements are not entirely consistent with the evidence, the ALJ did not err.  The ALJ relied upon

the facts, as noted above, that O'Brien had consistently normal mental status reports, the nature of

his treatment in 2017 and 2018, limits of his subjective complaints and his reports of daily living

and his ability to interact with others in some of those activities, R. 22-23, in considering

O'Brien's testimony.  This is sufficient evidence for a reasonable mind to accept the ALJ's

conclusion, particularly given the deferential standard that applies to the ALJ's assessment in this

regard.  See Anderson, 682 F. Supp. 2d at 97; see also Lynch, 368 F. Supp. 3d at 296-97 (holding

that a claimant's ability to perform some daily activities, conservative medical treatment and

mostly normal mental status examinations provided substantial evidence for the ALJ to determine that claimant's subjective complaints were not consistent with the medical record); Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (explaining that "evidence of daily activities can be used to support a negative credibility finding").

> c)      The ALJ Did Not Err in Finding Plaintiff Could Tolerate
>          Occasional Interaction with the Public

O'Brien argues that the ALJ substituted his own lay opinion for medical opinion in the record when he decided that O'Brien can tolerate occasional interaction with the public even though the two state psychologists who assessed O'Brien's medical record concluded O'Brien could not tolerate any interaction with the general public.  D. 12-1 at 18.

The determination of a claimant's RFC is the ALJ's responsibility.   20 C.F.R. § 404.1546(c).  The ALJ determines the RFC "based on all of the relevant medical and other evidence," 20 C.F.R. § 404.1545(a)(3), but is not required to "defer . . . to any medical opinion(s)," 20 C.F.R. § 404.1520c(a).  The ALJ must, however, explain how he considered the supportability and consistency of a medical source's opinions in articulating how persuasive he finds the medical opinions.  20 C.F.R. § 404.1520c(b)(2).  Here, the ALJ considered the state psychologists' opinions that O'Brien cannot interact with the public but concluded those opinions are unpersuasive because O'Brien's public interactions at doctors' appointments and at the gym indicate he can manage at least some public interaction.  R. 23 ("concur[ring] that the claimant's contact with the public should be limited, based on his subjective complaints, a total prohibition is inconsistent with the evidence").  Inconsistencies between O'Brien's daily activities and medical opinions provide reasonable grounds for discounting those medical opinions.  See Pressley v. Berryhill, No. 16-cv-40050-TSH, 2017 WL 5760915, at *16 (D. Mass. Sept. 8, 2017).  Accordingly, the ALJ did not err in concluding that O'Brien could occasionally interact with others in a workplace setting.

3.      *The ALJ Did Not Err at Step Five*

O'Brien makes two challenges to the ALJ's finding at step five that there are significant numbers of jobs in the national economy that O'Brien can perform.  First, O'Brien argues that the ALJ erred in concluding that O'Brien had a high school education and can communicate in English.  D. 12-1 at 14-16.  Second, he argues that substantial evidence does not support the ALJ's finding that O'Brien could perform the jobs identified by the VE because the VE's testimony was inconsistent with the DOT.  D. 12-1 at 16-18.

a)      The ALJ's Finding Concerning O'Brien's Education Level Is Supported by Substantial Evidence

O'Brien argues that he is illiterate and, therefore, the ALJ erred at step five when he determined that O'Brien had a high school education and can communicate in English for purposes of the Medical-Vocational Guidelines ("GRIDS").  D. 12-1 at 14-16.  Additionally, O'Brien argues that the ALJ should have applied rule 202.00(d) of the GRIDS to find O'Brien disabled given his illiteracy, previous work experience and proximity to advanced age.  Id. at 15-16.

In determining at step five whether a claimant can perform other jobs which exist in significant numbers in the national economy, the ALJ must categorize the claimant's education level.  See 20 C.F.R. §§ 404.1560(c)(1), 404.1564(b).  Here, the ALJ found that O'Brien "should be considered an individual with at least a high school education (as he was able to graduate high school while participating in special education classes per testimony)".  R. 24.  While O'Brien acknowledged in his application materials, R. 241, and at the ALJ hearing, R. 40, that he graduated from high school, he points to various statements in the record to argue that he is nevertheless illiterate, or otherwise has lower intellectual abilities than those usually associated with an individual who has completed high school, see R. 40-42, 60, 525.  But statements asserting O'Brien's illiteracy are contradicted by other evidence in the record and are not dispositive.  See

Lefebvre v. Saul, No. 18-cv-10400-RWZ, 2019 WL 5268799, at *4 (D. Mass. Oct. 17, 2019) (affirming the ALJ's determination that the claimant was literate despite the claimant's contradictory testimony). O'Brien stated in the disability report that he can speak, read and understand English and write more than his name in English. R. 239. In a written function report form for the SSA, R. 262, O'Brien, among other things, indicated that he had done writing, completed reports or similar tasks at his past job, R. 265. Finally, O'Brien's past work is categorized as semi-skilled, R. 68, which SSA regulations indicate is within the range of work that individuals with a high school education are generally able to perform. See 20 C.F.R. § 404.1564(b)(4). Notwithstanding some contested evidence regarding O'Brien's ability to read and write, there is substantial evidence to conclude that O'Brien should be considered an individual with a high school education, or at the very least should not be considered illiterate, for purposes of applying the GRIDS. See Lefebvre, 2019 WL 5268799, at *4.

O'Brien further argues that the GRIDS compels a finding that O'Brien is disabled given his light work RFC, past work history, age and inability to communicate in English. D. 12-1 at 15-16. Rule 202.00(d) of GRIDS states that a disabled finding is warranted for individuals who cannot perform their past work, have a history of unskilled work experience, have a RFC limited to light work, are nearing advanced age (i.e. 50-54) and are illiterate or unable to communicate in English. 20 C.F.R. Part 404, Subpart. P, Appendix 2 § 202.00(d).

Rule 202.00(d) is not applicable for similar reasons as above. SSA regulations consider a claimant illiterate if he "cannot read or write a simple message such as instructions or inventory lists even though [he] can sign his or her name." 20 C.F.R. § 404.1564(b)(1). As detailed above, there is conflicting evidence regarding O'Brien's ability to read and write simple messages in English but there is, nevertheless, substantial evidence—including statements by O'Brien that he

can read, write and speak in English, O'Brien's ability to complete written reports at past jobs and O'Brien's graduation from high school—to support a finding that O'Brien is neither functionally illiterate nor unable to communicate in English as defined in the SSA regulations.  Accordingly, Rule 202.00(d) is not applicable in this case.

b)      ALJ Did Not Err in Relying upon VE's Testimony

O'Brien further argues that the ALJ improperly based his step five determination upon the VE's testimony despite alleged inconsistencies between the VE's testimony and information contained in the DOT.  D. 12-1 at 16-18.  Specifically, O'Brien argues that evidence in the record demonstrates that O'Brien has neither the reasoning nor language skills to perform the occupations offered by the VE in his testimony, some of which the DOT describes as requiring reasoning and language level two skills.  Id.

VE testimony should be "generally consistent" with the occupational information supplied by the DOT.  Auger v. Astrue, 792 F. Supp. 2d 92, 95 (D. Mass. 2011) (citing SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).  Before relying on VE testimony to support a determination, therefore, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [a VE] . . . and information in the Dictionary of Occupational Titles . . . and [e]xplain in the determination or decision how any conflict that has been identified was resolved."  SSR 00-4P, 2000 WL 1898704, at *1.  "At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency."  Id. at *2; see Le v. Colvin, No. 15-cv-30157-KAR, 2016 WL 7104835, at *9 (D. Mass. Dec. 5, 2016).  A conflict must be "readily apparent" or "so obvious" to warrant a finding of reversible error.  Auger, 792 F. Supp. 2d at 97-98 (citing SSR 00-4p, 2000 WL 1898704, at *2).

There was no apparent conflict that the ALJ was required to resolve, and therefore, no error in relying on the VE's testimony for several reasons. First, the ALJ asked the VE whether his testimony was consistent with the DOT, R. 72, and thus satisfied his basic duty under SSR 00-4p. See 2000 WL 1898704, at *2; see also Le, 2016 WL 7104835, at *9. Second, although the price marker and subassembler positions indicate reasoning level two in the DOT, the VE testified that these positions require no more than simple, routine tasks. R. 68-72. The VE further testified the jobs could be performed by an illiterate individual who learns through demonstration and oral instructions. R. 73. The ALJ was free to consider the more specific information about the jobs provided by the VE based on the VE's experience rather than relying exclusively on the DOT descriptions, which significantly, list the maximum requirements of each job classification. See SSR 00-4p, 2000 WL 1898704, at *3; see also Le, 2016 WL 7104835, at *9. Third, "[c]ourts regularly have found that DOT reasoning levels two and three are consistent with an RFC limitation to simple and unskilled tasks." Hurlburt v. Colvin, No. 15-cv-30173-KAR, 2017 WL 1206397, at *8 (D. Mass. Mar. 30, 2017). Such a conclusion is consistent with SSA policy which holds that "unskilled work corresponds to an SVP of 1–2" and that "the regulatory definitions of skill levels[, not the DOT,] are controlling." SSR 00-4p, 2000 WL 1898704, at *3; see Charkowski v. Berryhill, No. 15-cv-13356-GAO, 2017 WL 1080910, at *5 (D. Mass. Mar. 22, 2017) (explaining that DOT and SSA regulations categorize skill level by different standards and that SSA regulations control when standards are not completely congruent). All these reasons support the ALJ's conclusion that O'Brien would be able to perform the jobs the VE identified. "Courts in this District have held that an ALJ's duty to resolve conflicts in a VE's testimony arises only when the 'inconsistencies are both "apparent" and have been "identified" in the administrative

hearing.'" id. at *7 (citations omitted), neither of which was true here.  See Auger, 792 F. Supp. 2d at 97-98.

## V.      Conclusion

Based on the foregoing, O'Brien's motion to reverse, D. 12, is GRANTED IN PART and DENIED IN PART, and the Commissioner's motion to affirm, D. 16, is GRANTED IN PART and DENIED IN PART.  The matter is REMANDED to the ALJ as to the physical RFC findings for proceedings consistent with this decision.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge